## ELROD *et al.* v. ADAIR.

No. 5855.   Opinion Filed November 23, 1915.

Rehearing Denied December 21, 1915.

(153 Pac. 660.)

1.   **GUARDIAN AND WARD—Guardian's Deed—Fraud—Sufficiency of Evidence.** The evidence has been examined and summarized in the opinion; and it is **held** that it is sufficient to warrant the court, in the exercise of its equitable powers, to cancel the deeds made by the guardian to the lands of the minor, and to annul the order of the county court confirming same.

2.   **JUDGMENT—Jurisdiction to Vacate—Fraud.** The district courts of this state, in exercising their equity jurisdiction, have the power to vacate and annul orders or judgments of other courts, in a proceeding brought for that purpose, for fraud, inducing and entering into such order or judgment, where such fraud is extraneous to the issues in the proceeding attacked, and especially where the court has been imposed upon by such fraud.

(Syllabus by Brewer, C.)

*Error from District Court, Nowata County;*
*T. L. Brown, Judge.*

Action by Levi C. Adair, a minor, by Samuel Adair, his father and guardian, against George A. Elrod and others.   Judgment for plaintiff, and defendants bring error.   Affirmed.

*W. A. Chase, W. J. Campbell, Dean S. Benton,* and *Tillotson & Elliott,* for plaintiffs in error.

*Alvah C. Hough* and *W. D. Humphrey,* for defendant in error.

Opinion by BREWER, C.   This suit was brought by Levi C. Adair, a minor, by Samuel Adair, his father and guardian, in the district court of Nowata county, for the purpose of canceling a deed ordered by the county court of Sequoyah county, and the orders of court confirming same, which deed was made to Sam F. Wilkinson, and also a deed from said Wilkinson to Geo. A. Elrod, in which was conveyed the E. ½ of the W. ½ of the N. W. ¼, and the W. ½ of the N. E. ¼ of the N. W. ¼ of section 10; and the S. W. ¼ of the N. W. ¼ of the S. E. ¼ of section 3, all in township 27 north, range 15 east, containing 70 acres, and situated in Nowata county, for the reason and upon the grounds, as alleged, that the sale of said lands and the deeds thereto, and the order of court confirming same, were procured through the fraud, collusion, and contrivance of the said guardian and the said purchasers, by which said fraud the court was imposed upon through the suppression of bidding, as a result of all of which the lands of the minor were sold and conveyed for a sum greatly below their value.   The court found in favor of the plaintiff and entered a decree, annulling the deeds, the order of court confirming the same, ordering an accounting, into which the amount of consideration paid should be figured, and protecting the rights of the insurance company, which appears to have been treated as an innocent mortgagee.   To reverse that decree this appeal is prosecuted, and the grounds chiefly relied upon for reversal are:

(1) That the evidence was not sufficient; (2) that the court was without jurisdiction to grant the relief sought; (3) that the guardian participated in the fraud, if any was shown, and that therefore equity will withhold relief. We will consider the points mentioned in the above order.

1. Both the record and the briefs in this case are voluminous; but we will set out here a general summary of the situation presented by the evidence: Both this plaintiff and his father are Cherokee Indians. They lived, and the guardianship was pending, in Sequoyah county. The lands involved were a part of the minor's allotment, situated in Nowata county. Two other minor children, sisters of plaintiff, had allotted lands near or adjoining plaintiff's land. The father and mother also had allotted lands adjoining. On March 5, 1910, the guardian and his wife entered into a written contract with Wilkinson for the sale of their own lands, and also for the sale of the lands belonging to the three minors, for a cash consideration of a lump sum of $4,760. The father and mother owned 50 acres each; Levi, this plaintiff, 70 acres; his sister Edna, 60 acres; and Susan 50 acres—making a total acreage to be conveyed, under the contract for the $4,760, of 280 acres. Nothing was said in the contract about how the consideration should be divided; but to give an idea as to how they were to proceed under it, we excerpt the following passages:

"It is further agreed that said Samuel Adair, as guardian of Levi C. Adair, Edna B. Adair. Susan E. Adair, shall make and execute a five-year agricultural lease on the above minors' land to Sam F. Wilkinson and have the same approved by the court of Sequoyah county on or before March 10th and turn over to said Sam F. Wilkinson, or his assigns. * * *

"It is further agreed by Samuel Adair that he shall execute a warranty deed to his surplus part of his land and deposit in the Sallisaw Bank & Trust Company to be held in escrow, and shall make application at once for the removal of restrictions on his homestead part of the land and have same removed and as soon as same is removed, to make and execute another warranty deed to that part of said land, and deposit in the Sallisaw Bank & Trust Company to be held in escrow, and his wife, Mary Adair, has this day made and executed a warranty deed and deposited in the Sallisaw Bank & Trust Company, to be held in escrow by said bank and both deeds conveying both surplus and homestead part of their land shall be held by said bank until such date and time the said Samuel Adair makes and executes guardian deeds and make perfect clear title to all three of the minor children's land as guardian, and delivers them to the above bank and then the said Sallisaw Bank & Trust Company is instructed to collect $4,260 from said Sam F. Wilkinson and turn all deeds over to him.

"The party of the first part has this day deposited in the said bank $500.00 to be held as good-faith money. * * *

"The party of the first part [Wilkinson] agrees to pay the court costs for the re-probating of the case from now, and shall re-probate the case at his own expense, including all costs attached thereto from now on. * * *"

After the execution of the contract and the deposits made in the bank as stipulated therein, the probate proceeding was commenced to effect the sale of the lands. Separate petitions were filed for each of the minors, and they proceeded along simultaneously in the county court until June 6, 1910, the initial day for the reception of bids. On that date Wilkinson was in Sallisaw, and Elrod went there for the admitted purpose of bidding on the lands. It seems that Wilkinson met him at the

depot, and had several conversations with him, and took him to the bank and trust company and showed him deeds from the guardian and his wife to their own lands. There is some doubt as to whether Elrod was shown the contract above referred to, but the court found as a fact that he was well aware of same, and the evidence and inferences properly deducible therefrom justified the finding. During the day, Wilkinson and Elrod were together at different times in the office of the attorney handling the proceedings. Wilkinson made a bid of $10 per acre for plaintiff's land. Elrod says that he, about the same time, made out a written bid there in the office of the attorney, and thought it was filed. He does not give the amount of the bid, and says that he did not know how much Wilkinson's bid was. However this may be, no bid from Elrod found its way into the hands of either the clerk or the judge of the court. After the meeting between Elrod and Wilkinson, negotiations began between them, which resulted in an agreement, later that evening reduced to writing and signed, in which contract the following appears:

"Wherefore, said party of the first part agrees to deed upon receiving the guardian's deeds from Samuel Adair, guardian of Levi C. Adair, Susan Adair and Edna B. Adair, all of the above named minors' land and including Samuel Adair, Mary Adair, his wife, their land in fee, and Jennie M. Blair, *nee* Adair, land in fee, for the cash consideration of $25 per acre all around. * * *".

The court ordered the sale to Wilkinson on his bid; and in compliance with his contract, Wilkinson conveyed all the land, both adult and minor, to Elrod. None of these contracts or negotiations between these parties, we are very glad to say, were known to the court. On June

20, 1910, thereafter, the sale of these various lands to Wilkinson was confirmed by the county court; and on that day it appears that Wilkinson made payment for the lands in pursuance of his original contract with the guardian for their purchase, and distributed the proceeds, the $4,760, so that Samuel Adair and his wife received for their 100 acres $3,000; the present plaintiff, $700; his sister Edna, $600, and Susan, $500—which sums, added together, make a sum slightly in excess of that named in the original contract prior to the probate proceedings. In other words, the guardian and his wife received $30 per acre, and the minors $10 per acre for their lands. It appears that the lands were of the same general character, but that upon the lands of one of the adults there were some improvements, worth a few hundred dollars. Wilkinson carried out his contract with Elrod, and received $25 per acre for the lands of the minors, thus, as will be seen, making a very profitable bargain.

It further appears that before Elrod attended this sale, to reach which he had to travel a considerable distance, an oil well had been drilled in within close proximity to the lands of these minors; that the fact of the well was mentioned to the guardian, but was minimized by statements about its being only salt water, a little oil, etc. Whether Wilkinson knew of the oil well or not when he contracted does not clearly appear; but, from all the circumstances, we rather infer that Elrod had just a little more and better information than either of the other parties. Numerous other facts and circumstances, seemingly slight and unimportant, standing alone, have not been detailed, yet they may have aided the court in its finding, among other things:

"That at the time the last agreement was entered into, the said George E. Elrod had knowledge of the former agreement. That the tendency of the two agreements was to embarrass the guardian and to interfere with just performance of his duties and obligations, and to enable the defendants to acquire the land at a court sale by suppressed competition. That to uphold such conduct on the part of said Wilkinson and said Elrod would be in violation of the spirit and letter of the law, and conducive to fraud, and not only against the rights of the minor involved, but also against public policy."

As we have said before, there was ample evidence, considering it with the necessary deductions and inferences legitimately to be drawn from it, to sustain the finding of the court. Wilkinson, with his contract and the deeds of father and mother in the bank, was on the ground to buy the land. He knew what he was to pay, $4,760 for the 280 acres; so did the guardian know. If Elrod saw, or was informed of this contract—and the court found that he was—then he knew. From this knowledge, each must have known that it was to the interest of the guardian to get the sale of his ward's land through for as little as possible; for the more the minor's land brought, the more the reduction would be of the aggregate to be paid for all the land. This set the interest of the guardian, as an individual, against his duty to his ward, as a guardian, and against the interest of his ward. No court, with knowledge of such a condition, would act at the instance of, or on the advice of, a guardian so circumstanced. Then, consider the conduct of the parties. After Wilkinson explained matters to Elrod, he took him to the bank and showed him the deeds from Adair and wife. Neither of those men admit that the contract was shown, but from their subsequent

dealings it is inferable that it was. Then, too, both of them knew that if they did not come to an understanding, to get the land they must compete in the bidding. Of course, neither could see where that would end. Wilkinson might well have apprehended that if he bid up the minor's land too high, it would not leave enough in his hands, under his contract, to satisfy the guardian, and he could easily see breakers ahead. Elrod had only one object, to get the land; so, if he could so arrange it to get it out of court, he, too, would escape the hazard of open competition. So, to serve the ends of the guardian, and let Wilkinson out of the matter, with the certainty of a handsome profit, and to secure the certain accomplishment of Elrod's purpose, the bargain, outside of court, was struck, and the interest of everybody, save that of the minor, was fully served. Of course the minor suffered, and because all these transactions on the day of the sale deprived it of all competitive character; whereas, without those arrangements, these two men at least would likely have been competitors. These dealings amounted to a fraud upon the court and against the minor. They were frauds outside of the case in court. They were unknown to the court; and therefore the court could not protect the minor, and nobody else seems to have had any motive, or even a passive inclination, to do so. We, therefore, hold that the point that the evidence is insufficient is not well taken.

2. The equity jurisdiction of courts may be invoked, and it will grant relief against "an order, judgment, or decree of some other judicial tribunal entered in some civil action or proceeding of which it had, or assumed, jurisdiction" (Freeman on Judgments [4th Ed.] sec. 484) if the circumstances and reasons assigned

are such as call into action the equitable power and jurisdiction invoked. It is said in Freeman on Judgments (4th Ed.) sec. 484:

"The jurisdiction of equity to interfere in any way or to any extent with proceedings at law, though it excited the jealousy of the common-law judges and was hotly contested, has been well established for nearly three centuries."

Of course assistance in equity cannot be had merely for the asking; it will only yield its aid against the effect of judgments or decrees where the circumstances set forth in the petition are such that, in the view of a court of equity, it is unconscionable to allow to the judgment or decree its usual or ordinary effect.

It is not necessary to discuss or set out here just what circumstances will justify the interposition of equity, for we have in mind the instant case, in which relief is grounded on the claim of fraud, collusion, and conspiracy between the guardian making the sale and the defendants, who were mediate and immediate purchasers thereunder, and through which it is claimed the court was imposed on and the minor prevented from securing an adequate price for his lands. That courts of equity have the power to vacate and annul orders and judgments of other courts, in a proceeding brought for that purpose, for fraud of the parties, inducing and entering into such order or judgment, where such fraud is extraneous to the issues involved in the proceeding attacked, practically all the authorities agree. Such is either held or intimated in practically all the cases in this court in which "direct" and "collateral attack" are discussed. *Eaves v. Mullen,* 25 Okla. 679,

107 Pac. 433; *Steele et al. v. Kelley et al.*, 32 Okla. 547, 122 Pac. 934; *Continental Gin Co. v. De Bord*, 34 Okla. 66, 123 Pac. 159; *Brown et al. v. Trent et al.*, 36 Okla. 239, 128 Pac. 895; *Johnson v. Filtsch et al.*, 37 Okla. 510, 138 Pac. 165; *Sockey et al. v. Winstock et al.*, 43 Okla. 758, 144 Pac. 372. Therefore, it is not necessary for us (commissioners), for a proper determination of the instant case, to discuss *Brown et al. v. Trent et al.*, *supra*, and *Continental Gin Co. v. De Bord*, *supra*, under the rule of which cases this proceeding would be called a "direct attack," in the light of *Sockey v. Winstock*, *supra*, under the rule of which it would be called a "collateral attack," for, under either doctrine, it is a "permissible attack." However, the writer, were it left to him, is quite convinced that a suit in equity, brought to cancel a deed ordered by a court of probate, and the order of court confirming same, on the sole ground that the extraneous fraud of and conspiracy between the guardian and the purchaser induced and entered into the sale and orders, is a direct attack, as is stated by Van Fleet's Collateral Attack, sec. 2, where the author says:

"A motion for a new trial or for a *venire de novo;* a motion in the cause to vacate, modify, or correct the judgment according to the statute or the practice of the court; appeals; writs of error, *certiorari, audita querela,* and prohibition; petitions for rehearing and bills of review; bills in equity, or complaints and petitions under the Codes to set aside, vacate, modify, or correct judgments for fraud, accident, mistake, or excusable neglect —are some of the modes provided by law for avoiding or correcting judgments, and are direct attacks with which this work has nothing to do."

We note here that the recent decisions of this court (*Baker v. Cureton*, 49 Okla. 15, 150 Pac. 1090, and

*Hathaway v. Hoffman,* 53 Okla. 72, 153 Pac. 184) in no wise conflict with the views expressed. Indeed, in the last-named case, the court is careful to say: "There was no fraud charged." Nor is *Sawyer v. Ware,* 36 Okla. 139, 128 Pac. 273, contrary to the views expressed. In that case the cross-petition sought to avoid the effect of the decree because of errors at the trial, viz., "insufficient service and failure to appoint a guardian *ad litem,*" which errors appeared in the record 'and should have been corrected by appeal. We therefore are of the opinion, and so hold, that the court had jurisdiction. The claim that the jurisdiction fails, because plaintiff had an adequate remedy at law, is without merit. The county court would have been without power to afford much of the relief sought in this suit. An accounting and adjustment of the equities between the parties, and the protection of the mortgagee, and the relief in favor of the minor against Elrod, as a protection against the mortgage, and other things lay outside the power of the county court.

3. The further point is made that, even if the evidence is sufficient and the court had jurisdiction, yet the relief should be denied, because the guardian bringing the suit participated in the fraud, and is therefore in a court of equity without "clean hands." So he is. It takes no second look or microscopic view to see how seriously—yea, how pitifully—his hands are stained; to see that he put himself in such a position, by his contract with Wilkinson, that the less he got for his child, the more he got for himself. But this does not defeat the suit of the innocent minor. This is the minor's suit; he owns the subject-matter. If relief comes, it is his relief. The doctrine that the sins of the father may be visited

on the children "even to the third and fourth generation" (Exodus, xx, 5) does not apply.

We therefore recommend that the judgment of the trial court be affirmed.

By the Court: It is so ordered.